Mr. Schuman, on behalf of the faculty representing Declan Thomas Froman, Daniel C. Kirk, and on behalf of faculty, Gregory Hamsky, Matthew Bolton-Chiles. Good morning, counsel. With regard to counsel for the appellees, have you decided you're going to divide, or have you talked about dividing your time? We have discussed dividing, and Your Honor, we will both appear to be the ones using 15 minutes to be extended. If the court has questions for one or the other of us, we're willing to cede the time to others to address the court's questions. Okay. Thank you. All right. Mr. Schuman? Good morning. Good morning, Your Honors. Counsel? Good morning. Can I please see the court? Two orders on appeal. First is Judge Hall's opinion in order wherein he ruled that a particular restriction, Section 7 restrictions in the CCRs are unenforceable because he found, one, that they constituted a personal right of the developer, and two, because there was no assignment of those rights expressly by the developer to the law owners. Judge Hall's opinion also found that the amendments to the CCRs were prohibited. The second order is Judge Hoffman's. Well, I didn't find that the amendment was prohibited. What he found, Your Honor, is that the amendment couldn't enlarge or continue. Correct? I believe he did that as well, Your Honor. I mean, the point is, is that you were claiming that amendment meant something other than what he thought it meant. I think he found both that you could not amend them at all, you could only terminate them, and further, that you could not extend or broaden them as well. So I think that's a fair characterization, Your Honor. Judge Hoffman's order, of course, also deals with the scope of discretion under Rule 137. And, of course, we recognize this will be reviewed under an abuse of discretion standard, and our position is that the discretion is not unlimited. With respect to the first order, if I may, what's at stake here is not just the issue of whether a neighbor gets to keep a stockade perimeter fence on their property, or whether the law owners have the right to enforce restrictions against fences being erected with impunity or other items such as sheds. What's also at stake here is whether they have the right to ever, down the road, amend the CCRs. We believe that affects the potential value of the property. Is your initial position that the document is ambiguous or non-ambiguous? My initial position is I believe Article 7. It could have been written better, Your Honor, but I believe it is unambiguous that you are allowed to amend. But to the degree the Court finds that it is ambiguous, we've, of course, argued that the Court should then consider parole evidence, as Judge Hall recognized. And, of course, the very drafter of the CCRs, Mr. Thomas Gooch, who is currently the highway commissioner for Cuba Township, has explained what the intent was. And on that particular point, for some inexplicable reason, Judge Hall in footnotes seemingly questioned the motivation of Mr. Gooch. And we pointed out in the record, Mr. Gooch has absolutely no financial interest in this, has no personal interest, didn't receive a penny for his services in preparing his affidavit. So I found the footnotes to be a little surprising, frankly. What's at issue primarily is a completely unambiguous restriction that says clearly no fence shall be erected unless and until that fence is approved by either the developer or, alternatively, the Committee of Three Architects. So, essentially, you can seek a variance, if you will, or a waiver of the application of only the restrictions in Article – excuse me – Section 7 of Article 2 if you can obtain that waiver or variance from one of those alternatives. Now, of course, there's no dispute the developer is out of business. It's been insolvent for years. Our position is this is an unequivocal, unambiguous restriction on the erection of fences. The developer retained absolutely no right whatsoever to modify or revoke any of the restrictions. The developer also retained no right whatsoever to enforce any of the restrictions. Those rights expressly and unambiguously rest solely with the latter laws. So the developer, only in the developer's role, temporary role as an owner, did the developer have a right to enforce any of the restrictions. That's unambiguous. There's no language that's been cited by anyone. The Court didn't identify any language that suggests otherwise. It's undisputed that the Fromans erected a stockade perimeter fence without trying to seek approval or a variance or a waiver from anyone. Now, we believe that because of the clear and unambiguous restriction, the mere right, the mere reserved right of the developer, which was only to waive application of certain restrictions, i.e. the restrictions in Section 7 only, that does not affect in any way the validity or the existence of the otherwise enforceable and non-revocable restrictions. It can only be revoked, if at all, by the owners, pursuant to their right of amendment. And it can only be enforced explicitly and unambiguously by the owners. No right whatsoever was retained by the developer to enforce anything. Now, the Fromans argued the contrary. They suggested this mere right to, this mere reserved right to waive application of Section 7 restrictions somehow converts that mere reserved right to a right of enforceability. Well, it doesn't say that. And, frankly, I think the argument is not logical. Furthermore, that right, that reserved right to waive application of Section 7 restrictions is qualified. As a matter of law, it only lasts for a limited duration, the period of time that the developer owns the properties. And those cases are cited in the Fairfield's decision, which the trial court relied upon, in our view, misapplied. So it's a limited duration. Furthermore, it's qualified. It wasn't within the sole discretion of the developer. The developer did not even retain the sole right to approve fences. It shared that right. It gave all the lobbyists the right to override the developer's refusal to allow for a variance or a waiver of the fence restriction by a committee of three architects, only one of which can be appointed by the developer. The other would be appointed by the owners. And that three committee would then make that decision. So the mere limited qualified right was not even within the sole discretion of the developer.  Indeed, all the restrictions are exactly what you would expect to see for a typical type of residential subdivision-type restrictions. These restrictions in Article 2 deal with buildings that cannot be erected other than homes. You can't have noxious fumes and chemical-type structures on the properties. Restrictions on sewage disposal. No stables or other quarters shall be erected. Trucks and trailers. These are typical types of restrictions which evidence a general plan to benefit the overall subdivision and a lot of it, which is the antithesis of a personal right. I just want to clarify something. Sure. Judge Hall only found that particular section gave the builder the right of refusal. Is that not correct? He didn't find all the others. That's right. He expressly said that all of the other CCRs are not personal rights. He said that Section 7 was qualitatively different. And he specifically said, and his analysis is limited to this, he says, I find, essentially, that the restrictions in Section 7, like the ones in the Fairfields decision, quote, share the characteristics of a personal right. He then went on to find that because there was no assignment, express assignment, that, therefore, that meant that this was, A, a personal right which is unenforceable by the lot owners, despite the explicit language of the contrary, and that it was somehow transformed into a right only enforceable by the developer. No language that supports that. He didn't cite to him anything. He ignores the key points regarding what constitutes a personal right under the Fairfields decision, which is, first of all, it has to be exercised solely by the one who imposes the restriction. Well, again, the developer didn't have a sole right. If you want to view the mere restriction, or excuse me, the mere right to waive as somehow affecting a restriction, it wasn't within the sole discretion of the developer in the first place. And it certainly wasn't for the sole purpose. So now this is, how would you interpret this? I interpret it as a mere right, reserved right to waive application of a restriction which is otherwise completely enforceable, exists, and is not revocable unless the homeowners revoke it. Because there's no, absolutely no language that supports a right of enforcement of the developer. Well, if you assume literally that a homeowner stepped into the shoes of the developer and the developer refused, then why wouldn't the section that relates to the appointment of three architects still have application? Such that the complainant would appoint an architect, the person putting the fence up would have an architect, and then those two architects would pick a third. So, to me, there are at least two reasonable interpretations. One mine, one yours. I don't disagree with your characterization. You're absolutely right. One is selected by the developer, assuming it's in existence. One is selected by the homeowners, and those two select the third, and the majority decides. If the developer initially refuses to grant what is requested by the homeowners, And if supposedly your homeowner is going to step into the shoes of the builder and enforce it literally like you said, you have literally redacted the second portion that gives an alternative form of relief. Well, that doesn't relate to the restriction. The restriction is you can't build a fence unless you get the waiver. The process we're talking about is simply a process by which you may obtain a waiver of the application of the otherwise existing restriction. So, the process by which you may be able to get that variance or that waiver doesn't affect the enforceability of what is otherwise an existing and valid restriction, that you can't erect a fence if you don't get that waiver. So, there's no language that says there's a right to enforcement by the developer anyway. That just deals with the right to waive application of an otherwise existing restriction. So, you're saying the fence builder should have made a determination, and since the builder is no longer in existence, he should have sent some sort of notice to all the other homeowners in the subdivision, so that all the other homeowners should have either agreed or not, in which case all the other homeowners should have appointed one architect, and then he appoints one architect, and then they sit down and pick a third, and then they determine whether or not there should or should be a fence built? Your Honor, I'm saying that the process articulated in Section 7 regarding the potential ability to obtain a waiver of the fence restriction is irrelevant to the question of whether there is a fence restriction and the question of who has the right to enforce it. What does it matter whether there's a process by which you may be able to circumvent the restriction? You may or may not be able to circumvent it. I think it's called standing. Maybe I'm wrong. The way I read the section, the builder is the one who has standing to bring this until such time as supposedly disappears and disappears in the thin air. But if it's a personal right, then how does anybody else have standing to quote-unquote raise or protect his rights? The only ones who have any rights to enforce the covenants are the owners. The developer had that right when he was an owner and only when he was an owner. No other language in the CCRs creates any right of enforcement except to an owner. The developer is no longer an owner, so it has no right to enforce the fence restriction. We're saying there's a fence restriction. The right to the mere reserved right to waive application of that fence restriction doesn't affect the validity and existence of that restriction whatsoever. It certainly doesn't transform into a enforcement right. The top court got confused in this, frankly, because he characterized this as a right to control fences. The issue is the right to enforce the restrictions. He agrees they have the right to enforce all the non-section-set restrictions without an assignment. And just as they didn't need an assignment to enforce the non-section-set restrictions, they don't need an assignment to enforce the section-set restrictions, because the right to do that— Is there a restriction independent of the rights that were set forth in that section relating to the builder that said something like, there shall be no spikes on the top of the fence or that the fence shall not be electrified? Is there something someplace else, other, that sets forth what the restrictions are? Section 7's restriction is the only language that deals with the fence restriction. There's Article 2 restrictions in which there's eight restrictions. Section 7 is merely one of them. He's corrected it's qualitatively different only in the sense that it has this ability, and the only one that has an ability, to circumvent the restriction by getting this waiver of the restriction which otherwise exists. Who has that right? Either the developer or the Committee of Three Architects. It wasn't reserved solely to the developer. But the fact that the developer is out of business and can no longer exercise that minimum reserve right doesn't affect what is otherwise an existing and valid restriction on the erection of fences and accessory buildings, sheds, and all the other items—wells and septics. Now, if you can't get that process, if you can't obtain that variance process, what happens? Nothing. The restriction exists until it's amended by the homeowners, which we strive to do here. But you don't need the right, the reserve right to modify or waive application of the restriction. I believe it's completely irrelevant to the enforceability and existence of the restriction. And it's clear there's no language anywhere that gives a developer any right of enforcement, no right of enforcement other than in its role, temporary role, as an owner. So when it sold its last lot, it had no more right of enforcement. Who does? Only the homeowners. That's what the language says. And neither the Fromans nor the Court appointed any language to the contrary because it simply doesn't exist. Now— So there are other fences that existed prior to— There were three fences—this is an effort by the Fromans, frankly, where they tried to mislead the courts. There were three fences that are on unique properties which were approved by the developer into original construction of the subdivision. Why? They're unique lots that back up and above to a strip mall. So, again, there's a restriction on the fence unless and until that restriction is waived by the developer or the committee. The developer expressly waived and erected himself when they built those original homes. So if I understand your interpretation, in 19—I think it was 1999 when the construction company was dissolved, no one could build a fence that didn't exist before. No one could tear down a fence that was there before. No one could repair a fence that was needed repair because once that developer disappeared, then the covenants and restrictions set in concrete or stone, the status of each and everybody's parcel of property can remain inviolate for the rest of eternity or until, supposedly, there's covenants and restrictions that are amended by a majority or two-thirds. Well, you're right. We've already had an alternative. To the degree the intent of the CCRs could only be effectuated by an implied covenant or an implied assignment, then we should have that or that would exist. We don't think we need that because I don't think the right to waive application of the restriction is necessary to the right of enforcement. But I agree with you. Absent that, yes, if the mechanism for obtaining a waiver of the restriction cannot be satisfied, then until it's amended, that's one of the reasons you get to amend it, so that you don't have this kind of problem. There's an express right, we believe, to amend the CCRs within reason. You can't dramatically alter the existing restrictions, and we haven't done so. We've merely tried to stay within the complete confines of what the restrictions were, i.e., Section 7. And we try to retract the two-thirds majority ruling of amendments and apply that to the barriers, okay? Now, the important thing I want to make here, Your Honor, is that Judge Paul is ruling out whether this was a personal right on the fairway. He's completely ignored the salient points of what constitutes a personal right. A personal right on an oral law clearly can only be exercised by the one who imposes that restriction. That's not the case here. The developer grants every homeowner the right to override any refusal by the developer to grant that variance by the committee. So, indeed, he reserves that limited right to the developer. He also ignored the fact this is of the type of restriction of a general plan for the benefit of the subdivision and the homeowners. It benefits the homeowners at least, if not more, than the developer. In fact, the developer's rights extinguished when it sold out its last lot. Fairway cites decisions which hold to that very point, and that's the language of the CCRs as well. Doesn't the language say that the rights of the homeowners are only to terminate any provision of the covenants, and that right arises only after April 1 of 05? And there's nothing about any other rights that the homeowners have. They declare this is a covenants. They indicate the covenants run with the land. I think the Court found that the covenants run with the land. But the covenants from the same point of Section 7, the Court found that it's a personal right to the developer only, not to all the people that live in the subdivision. All the restrictions, including Section 7, run with the land and are expressive for the benefit of the homeowners, as expressed in the CCRs. It's only if you label it. If you can correctly label something a personal right, then Judge Hall believes, which I think I'm incorrect in, that somehow now you've automatically transformed this into an unenforceable right, contrary to the expressed language in the CCRs, which say all of these are for the benefit of the homeowners, and they are the ones that have the sole right to enforce them. So he's found that once I had the label personal right on there, now it transforms into somehow, again, this is just a limited right to waive application. Somehow, I don't know how that affects the restriction. The offense restriction is completely separate and independent of this limited reserve right to waive application of the restriction. But nevertheless, he's basically saying implicitly, okay, I find that this waiver process is akin to a personal right, even though it isn't solely within the discretion of the developer. It's not solely for his benefit. It ignores that it's a general plan for the benefit of the homeowners. He ignores all of that. He ignores that, again, personal rights are typically those where you have the sole right to revoke and modify them and enforce them. The developer has none of those rights. He ignored all that and found it's a personal right, and therefore, because there was no assignment, he found that it was unenforceable by the law. It's somehow enforceable now. It transforms into somehow enforceable by the developer. Well- Counsel. Yes. I'm just going to ask you if you would reserve the remainder of your comments for rebuttal, please. Sure. Thank you. And then we have either Mr. Kurth or Mr. Vasconcellos. Good morning. May it please the Court, my name is Dan Kurth. I represent Thomas and Catherine Froman, two of the appellees here today. Mr. Adamski, prior counsel for the Fromans, is also an appellee as to the limited issue as to a fee of award. I do not represent Mr. Froman. Again, he has separate counsel here today, and we have agreed that we're going to try and split our time to the extent possible. So given the limited time for the two sets of appellees here, I do understand that the standard of review on an order of summary judgment is a de novo review. We certainly believe that our position is that Judge Hall got the order correct on October 26th, that summary judgment was properly granted in favor of the Fromans and allowing their offense to be reviewed. Let me ask you a question. You're taking the position that this entire document is unambiguous, so we can review it de novo? That's correct. Including Section 7? That's correct. In the context of all the language? That's correct. Okay. So, again, I'm happy to answer any specific questions the Court has. If not, I understand the Court has written briefs because there was extensive briefing on the summary judgment phase. And, again, in front of the appellate court, on a de novo basis, I don't want to belabor the briefs. If there are any specific questions to start, I do have a few points I'd like to just address quickly and then cede the rest of the time to a voter. Is the section that Judge Hall interpreted the only section that relates to the grant or denial of a covenant or restriction that runs with the land? In other words, are all the other covenants and restrictions either affirmative or negative? Things like you shall constantly see to it that your dog is curbed or you shall not have any tanks that store gas and oil. Absolutely. And there's a misnomer that's been used in the briefing that refers to Section 7 as a fence restriction. There is no fence restriction in Section 7. There is no fence restriction in the 1987 CCRs in general. Section 7 is unique and deliberately differently drafted from the other sections in Article 2. Sections 1 through 6 and Section 8 are absolute restrictions, like the Ten Commandments, if you will. Thou shalt not X, Y, Z, A, B, C, what have you. Section 7 is different, and it's not an absolute restriction, and it's a fairly broad-based provision. And what it does is it addresses certain activities that can take place underneath the 36 lots in this development. And it specifically addresses dwelling houses, accessory buildings, wells and septics, and fences. All of those are grouped together in Section 7. And it provides not that there's an absolute restriction on dwelling houses, buildings, wells, septics, and fences. It provides that the developer has almost a right of first refusal. It has the right of approval. And it reserves it specifically for the developer, Hubschman. And as the Court's heard, as there is no dispute, Hubschman went out of business in 1999. But Hubschman has the right of approval, and it is a personal right reserved just for Hubschman. Counsel attempted to distinguish it and state that because there's this panel of architects that can subsequently be appointed, that doesn't mean that it's less of a personal right for Hubschman. All of Section 7 is within Hubschman's control. Because if it elects to say, I approve whatever it is you have proposed for your property, then it doesn't need to go to any panel. The right, the personal right created for Hubschman, isn't a broad absolute right. It is the absolute arbiter of yes or no, but it still does not make it less of a personal right. It still has the right, but it's created its own little right of appeal within that right that says, if you don't like my decision, I'll appoint an architect, you appoint an architect, they appoint a third architect, and we can decide. But it's still ultimately the first bite of that apple is up to Hubschman. Now, another critical provision in Section 7, which I think has been overlooked, and I think Your Honor did address it somewhat after 1999, as to what happens if this is enforceable after Hubschman went out of business, it doesn't mean that everything is cast in stone. These are 36 homes now in this development. None of them are brand new constructions. They've all been around for a while. Hubschman started us, the CCRs, in 1987. Section 7 provides that any alteration to a dwelling house, an accessory building, or a fence that costs more than $1,000 has to be approved in the same process. Hubschman gets to say yes or no. If Hubschman says yes, then it doesn't go any further. If Hubschman says no, then again you get to the appointing of the architects. Now, you can't tell me that $1,000 is a particularly high limit. If you put new windows in your home, storm windows, that's going to exceed $1,000. That's an alteration. A roof, frankly, a new furnace, a new hot water heater. You remodel your bathroom, frankly, an interior decorator that comes in and paints it could, in theory, be an alteration to a dwelling house that conceivably could require the approval of the architect. This provision was designed and is included and was drafted distinctly and differently from the other sections in Article 2 because it was for the developer and the developer's benefit. Once it sold the first lot, it sled 35 more to sell. It wanted the right to approve what was going on in the development until it was out, and frankly, it didn't care once it got out. The other provisions that it cared continued after it was gone. There's no personal rights in there. There's no reservation for Hubschman in those other provisions. Section 1 to 6, Hubschman knew they didn't want people parking their RVs in their driveway. That wasn't something he wants the right to decide. But the design of your building, the design of your outbuildings, the design of a fence, he wanted the right to control that, or Hubschman, as a company, wanted the right to control that while it still had some skin in the game. Once it was out, it was no longer of concern to it, and it is a discrete and different element and drafted differently than the other provisions. Judge Hall based a lot of his decision on the fairways opinion, and I think it's very important for the Court to note that the fairways came down in 1983. The CCRs weren't drafted until 1987. The drafters of those CCRs are charged with the knowledge that fairways, second district court, second district opinion, if they knew that's what this development was going to be, that's the law of the land. So the people that drafted the CCRs either knew that this was going to be a personal right and meant it to be exactly as we are arguing on behalf of the felons, or the Court would have to assume that not only did the drafter not understand what it meant, he was either ignorant of it or deliberately drafted it in contravention of what it means. That's not how you interpret a document. You interpret it by the law at the time it was written and the time it sought to be enforced. Well, fairways was good law at the time it was drafted, and it's still good law. So, again, there is no absolute fence restriction. The provision is broad. It deals with construction and alterations. Those things go on every day or certainly on a regular basis in the subdivision. Once Huffman went away, the rights to enforce Section 7, whether you call it the limited right of waiver or right of first refusal or restriction, however you choose to characterize the provisions in Section 7, all of those provisions are a limited right, and they went away when Huffman went away. The rest of the CCRs are running with the land. They are enforceable, and we aren't arguing that. It seems to me what you're arguing is that if we were to interpret Section 7 the way the appellant wants us to, then any owner on any lot could put the kibosh or preclude the replacement of anything that costs more than $1,000. Or am I putting words in your mouth? I think that's really the difficulty in terms of the practical interpretation of it, because if the court doesn't determine that Section 7 is a personal right that extinguished when Huffman went away, now, Huffman could have assigned it, and perhaps that was its intent, but it never did that. And perhaps it could have gone to a successor of Huffman, but, again, that didn't happen. So we never know what Huffman might or may not have wanted to do with that provision. But where we are now, if the court determines that it was a personal or was not a personal right, if it was different than how we're interpreting it, what Your Honor raised with Mr. Schuman in terms of were my clients supposed to go to the other 35 homeowners and say, this is what we propose, do they need a unanimous approval from the other 35? There's certainly a two-thirds approval after April of 2005 to terminate a provision, but not to approve it. And, frankly, this fence was built. This is a 2004 case. This fence was built before the two-thirds vote provision even came into existence. So at this point, do we need unanimous approval? What approval would we have needed to get from the other homeowners if not Huffman? And do you only go to that architect's approval provision if Huffman declines in writing your request for what you choose to build, be it a dwelling house, an accessory building, a well, a septic, or a fence? Same thing for any alterations to those. So it really would be an untenable, unenforceable provision if it is not the way we are interpreting it as a personal right. There is no homeowners association here. This is a collection of 36 individual lots or individual homeowners. Your Honor also raised a question of standing. I think it's interesting to note that while there were an abundant number of plaintiffs in the underlying case, there's a total of five homeowners representing three lot owners that are actually appealing this. So of the 36 lots in the subdivision, only three lot owners are actually appealing this. So I don't know if that affects the critical mass or the standing argument, but certainly there's not a two-thirds approval to pursue this appeal because they're not the appellants in this matter. Thank you, Counsel. I have a question. Do you wish to make any comments on the sanctions? I do not wish to make any comments on the sanctions that did not involve my clients. Thank you. Thank you, Mr. Vasconcellos. Good morning. May it please the Court. My name is Matthew Vasconcellos. I'm appearing on behalf of Gregory Adamski to address the sanctions issue. I know the opposing counsel did not get to this issue, so I'll be brief. I just want to make the point that there's an assumption underlying appellant's argument on this issue, and that is that the lower court was obligated to award 100 percent of attorney's fees requested, so long as those attorney's fees were reasonable. Now, Rule 137 just doesn't support that. I think we all agree that we're looking at this under an abuse of discretion standard. Really what we're talking about is three or four layers of discretion here under Rule 137. Is it three or four? I will say three. The court has the discretion, even assuming a 137 violation, the court has the discretion whether to impose a sanction at all. It has the discretion to determine the amount of the sanction, including attorney's fees, and it has the discretion to determine whether the attorney's fees requested were reasonable. Now, in this case, the lower court could have entered any sanction it thought was reasonable. It determined that the attorney's fees requested were not reasonable, but it didn't even need to make that determination to enter the requested sanction. It could have said I'm going to impose a sanction of $6,000 and left it at that without giving reasons. It could have imposed no sanction at all. I would submit that it could have imposed a sanction higher than the attorney's fees that were requested. I don't think there's anything in Rule 137 requiring the court or limiting the court to the attorney's fees requested. I think I'm going to leave it at that unless there are other questions. Did the judge say anything about why didn't counter plaintiffs bring or counter defendants bring a motion to dismiss, which would have saved everybody a lot of time and money? Well, that was one of the factors the court considered. Essentially, this argument was made to the lower court, and the lower court said yes, I agree with that point. This matter could have been disposed of with a motion to dismiss. There's nothing in the record to indicate that that's the only reason. There was no transcript available. There was no court report. All we have is the report of proceedings, which does mention this point as one factor. The report of proceedings does not say that this was the only factor or that the judge said that this was the only factor he considered. It was one factor he considered. Thank you. Mr. Schuman? Thank you, Harris. Let me read. With respect to the issue of the restriction, we have the testimony of the drafter. He has no incentive other than to explain to the court what was meant by the language. To the degree that there are problems generated by that language, it's not the fault of Lawrence. They didn't draft it. Mr. Gooch did. I don't want to be misunderstood with respect to our ambiguity argument. Our position is simple. We have said we believe the language is unambiguously clear that there is a right of amendment because the term amendment is utilized throughout the docket. To the degree, however, that the court finds that they don't agree with our position, we submit that it must be ambiguous as a matter of law in a minimum, in which case the proper course is to look to the cruel evidence of Mr. Gooch, who has unequivocally explained what he meant by what was meant in the intent of the offense restriction and the amendment provisions. Again, with respect to what constitutes a personal right under Illinois law, you have to have a restriction that is solely within the discretion of the one who imposed it. We don't have that here. It solely runs to the benefit of the one who drafted it. We don't have that here. Again, there's no right of enforcement, no right to amend or modify the restriction by the developer. Those rights rest solely with the law owners. The Fairway's decision, I believe, was misapplied. Counsel, your clients, do they understand that they may be put in a position where they can't improve their property based upon the argument that you've made? That's when we amended the CCR. Not just about fences, but all the other things that are contained in Section 7. We handled that through the amendments, Your Honor. You addressed that? Is there an amendment now, after 2005, that allows for these things? The amendments address the fences and the improvements over $1,000. And he said you couldn't do it. I'm sorry? Judge Hall said you couldn't do it. He said you couldn't amend, despite all the references to amendments throughout the document. It specifically says you can amend or terminate. What could possibly be meant by the term amendment or terminate? It's ambiguous. The word terminate is utilized in the same sense that he deleted from his opinion regarding the right to amend. Okay. So, again, to the degree that there's ambiguity, and I submit this is not a model of clarity, I believe it's clear enough, though, that it allows for amendment. To the degree it's not clear, it's ambiguous at a minimum, and the parole evidence should be considered. And there's no counterparole evidence from any other drafter. It's Mr. Gooch. With respect to Rule 137, we fully recognize and acknowledge that the trial court has wide discretion to decide what's reasonable. Here, the trial court did not deny 96% of the fees incurred, allowing only 4%. It did not do that on the basis that he thought that any of the charges were high or unreasonable. It was solely based upon his speculation that there was an alternative legal strategy that would have been, A, absolutely successful, i.e., a motion to dismiss, and would have been cheaper. I say pure speculation because no one has explained what the nature of that motion to dismiss should be. 2615, 2619, we don't know. No one's argued what the arguments would be. And further, since Judge Hoffman was not the original judge, it was Judge Hall, I fail to see how we could have any certainty that Judge Hall would have entered, with prejudice, unequivocally, a motion to dismiss. After all, Judge Hall was the same judge who, in our opinion, incorrectly ruled that the defense restriction is unenforceable and that we can't amend. And further, he initially granted the summary judgment motion to the counter-plaintiffs on their slander of title counter-complaint. Judge Hoffman, of course, later granted a summary judgment that that was incorrect, as well as found that it was frivolous. We believe it's simply beyond the proper discretion to hold the lot owners accountable for 96% of fees here to defend against a tort claim of $100,000 that was clearly frivolous, as found by Judge Hoffman. We think that's an abusive discretion and it's contrary to the whole purpose of Rule 137. Who was the prevailing party in this situation? Who was the prevailing party? Well, counsel commented about how there's only a few people here on the appeal. That's a function of the fact that they were scared off, frankly, by the counter-claim for $100,000. I'm talking about on the merits of the claim, which was either Section 7 has been properly amended and enforceable or Section 7 hasn't been properly amended and is unenforceable. Now, if there's a counter-claim for slander of title, you prevailed on that. They prevailed on the other. The question is, it's a term of art, who was the prevailing party? Who was the prevailing party on the ruling regarding the unenforceability of defense restriction? I'm sorry, I'm confused right now. Which do you think is the more substantive claim? The more substantive claim? The more at stake, actually, between the parties. Oh, I would argue the issue about the enforceability of the restriction and the ability to amend? That's what they're concerned about. That's what the neighbors are concerned about. They view it as an impact on their property values. If they can't, 10 years down the road, who knows what the changes and circumstances will be in the neighborhood. There's lots of open land in Lake Barrington adjacent to our subdivision. They want to be able to amend it in case there's something that comes down the pipe that will affect their property values. That's their major concern here. They're also concerned that they shelled out nearly $50,000 to defend a frivolous slander of title claim. They'd like to get their money back, frankly. But you ask for the major concern? It's their ability to control their destiny and the value of their properties. I don't have any further questions. Thank you, counsel. At this time, the court will take the motion.